Louis J. Capozzoli, J.
(concurring). The instant appeal arises out of incidents of alleged disorder connected with a racial protest by these defendants against illegal discrimination in the building trades unions. These incidents occurred on Eutgers Street and on an access road leading to a wire fence containing the entrance to a building site where public housing was in the course of construction.
On the basis of the evidence adduced at the trial, the court below found that these defendants darted into the path of trucks which were delivering construction material; some of them sat in front of and under the wheels of the trucks and others sat in front of the gate leading to the housing site itself. These actions interfered with the movements of the trucks so that they came to a complete stop and they were prevented from proceeding to their destination. The evidence also established that the defendants refused to obey the instructions of the police to move out of .the way so as to allow the trucks to proceed. On the basis of the total evidence adduced the court found all the defendants guilty of a violation of subdivisions 2 and 3 of section 722 of the Penal Law of the State of New York (disorderly conduct).
It is the contention of the defendants on this appeal that the evidence in the court below was insufficient to support the convictions, that they are protected by the First and Fourteenth Amendments to the Constitution of the United States, and that section 722 of the Penal Law has no application to their actions.
There was no real dispute below as to the evidence. The defendants admitted that they deliberately placed themselves in sitting positions before the entrance gate to the building site and also on the street, directly in front of the trucks and the wheels thereof. There is no dispute that their “ sit-down” conduct stopped and prevented the trucks from entering the site.
Such conduct was not normally to be anticipated. It constituted a disturbance of the public order by acts likely to produce violence and cause consternation and alarm. There is enough shown from which it can reasonably be seen that, had an adequate number of police not been present, the conduct of the defendants might have been retaliated by the truck drivers or others with serious consequences to the peace of the community.
The further conduct of the defendants in refusing to remove themselves from their obstructionist sitting positions, after repeated requests and entreaties by the police officers, and after being repeatedly warned by the police that the conduct of the defendants violated the law and that they could be arrested therefor, were all calculated to, and did in fact, violate section *636 722. There is no question but that the defendants, by their conduct and acts, annoyed, disturbed, interfered with and obstructed others (the truck drivers) by acts likely to produce violence and cause consternation and alarm, all of which tended to a breach of the peace. (Penal Law, § 722, subd. 2.) They also violated subdivision 3 of the statute by congregating on a public street and refusing to move on when ordered to do so by the police.
A review of the record below discloses ample evidence to justify the convictions of the defendants.
The defendants strongly contend that their actions were legal and not subject to prosecution, because they desired to dramatize the impairment of civil rights by labor unions in the building trades, and to call attention to acts of discrimination by them against Negroes. They further argue that they were engaged in a peaceful protest against these acts of discrimination and were engaged in an effort to have the laws prohibiting discrimination enforced. That in doing so, they maintain, they are protected by the United States Constitution as a proper exercise of free speech, proper exercise of the rights of public assembly and to petition for redress of grievances under the First and Fourteenth Amendments. In support of their position they cite the cases of Edwards v. South Carolina (372 U. S. 229 [1963]); Shuttlesworth v. Birmingham (373 U. S. 262 [1963]); Peterson v. Greenville (373 U. S. 244 [1963]); Johnson v. Virginia (373 U. S. 61 [1963]) and Lombard v. Louisiana (373 U. S. 267 [1963]).
An examination of those cases discloses that the reliance by the defendants upon them is entirely misplaced. The facts in the case at bar are so obviously different from the facts in all of the last-cited cases as to render the sound holdings of those cases clearly inapplicable to the behavior of these defendants.
This court is not faced with an orderly, quiet lunch counter sit-in which violates an unconstitutional city ordinance requiring the separation of the races in restaurants (Peterson v. Greenville, supra); or which violates an*‘ official command which has at least as much coercive effect as an ordinance ’ ’ and which directs the continuance of segregated services in restaurants (Lombard v. Louisiana, supra, p. 273); nor is the court dealing with a conviction for aiding and abetting persons to engage in an orderly sit-down demonstration (Shuttlesworth v. Birmingham, supra); neither is the court dealing with a contempt conviction which rests upon a Negro’s refusal to comply with the segregated seating requirements observed in a courtroom (Johnson v. Virginia, supra); wherein petitioner was held in *637 contempt for being “peaceably seated in the section reserved for whites ” (p. 62). Nor do we have the situation which was presented in Edwards v. South Carolina (supra) where there was an assembly of Negroes to peaceably express their grievances and where the court specifically found that “ there was no violence or threat of violence ” and further found “ there was no obstruction of pedestrian or vehicular traffic * * * No vehicle was prevented from, entering or leaving * * * the area of the demonstration” (pp. 231, 232).
As against these last-cited cases let us consider the case of People v. Stover (12 N Y 2d 462). In that case defendants placed a clothesline filled with old clothes and rags in the front yard of their home, in violation of an ordinance of the City of Eye prohibiting the erection and maintenance of clotheslines or other devices for hanging clothes in a front or side yard abutting a street. When prosecuted therefor the defendants urged, amongst other things, that the ordinance was unconstitutional and that it interfered with their right of free speech as guaranteed by the First Amendment. In passing upon this contention of the defendants the court said: ‘ ‘ This form of nonverbal expression is, we shall assume, a form of speech within the meaning of the First Amendment. [Citing cases.] However, it is perfectly clear that, since these rights are neither absolute nor unlimited [citing cases], they are subject to such reasonable regulation as is provided by the ordinance before us. Although the city may not interfere with nonviolent speech, it may proscribe conduct which incites to violence or works an injury on property, and the circumstance that such prohibition has an impact on speech or expression, otherwise permissible, does not necessarily invalidate the legislation.”
In the case of Matter of Trans-Lux Distr. Corp. v. Board of Regents of Univ. of State of N. Y. (14 N Y 2d 88, 91) the court said: “while conduct may be speech, it still remains conduct and does not cease to present its unique problems of social control. It is now the law that even peaceful picketing may be forbidden where it violates State labor laws that are not themselves designed as restrictions on freedom of speech [citing case]. Conduct that is proscribed for valid public purposes is not immune merely because engaged in with a view to expression (Giboney v. Empire Stor. Co., 336 U. S. 490).”
The holding in the last two-cited cases is directly contrary to the position taken by the defendants.
In the case of Gaynor v. Rockefeller (21 A D 2d 92) the unanimous opinion of the court indicated that racial policies of exclusion by some of the building industry unions “ are of so long *638 duration and so widely known that the courts might, if they so elected, take judicial notice of the fact” (p. 100). The court then indicated that the law provides punishment for business or labor organizations which discriminate unlawfully (citing Penal Law, §§ 514, 701; Civil Rights Law, §§ 41, 43; Labor Law, § 220-e, subd. [c]).
It is, therefore, apparent that these defendants had legal avenues open to them to bring about the objectives they seek.
While it is true that the Supreme Court of the United States has held that public grievances are within the constitutional protection of the First Amendment, it has also held that the manner of protest is subject to reasonable regulation and control in the interest of public safety and order. (Cox v. New Hampshire, 312 U. S. 569; Giboney v. Empire Stor. Co., 336 U. S. 490; Cantwell v. Connecticut, 310 U. S. 296.) (Also, see, People v. Galamison, 43 Misc 2d 72; People v. Martin, 43 Misc 2d 355.)
In Cox v. New Hampshire (supra, p. 574), the court said: “ Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.”
In Giboney v. Empire Stor. Co. (supra, p. 498), the court said: “It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to * *’ * conduct in violation of a valid criminal statute. We reject the contention now.”
In Cantwell v. Connecticut (supra, p. 308) the court said: “ The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those *639 belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.”
In People v. Martin (supra, p. 357) the court said: “ Thus, although the Supreme Court has decreed that the Fourteenth Amendment prohibits a State from making criminal the peaceful expression of 1 unpopular views ’, this does not imply that persons wishing to exercise the right to express their views may comport themselves in a manner which will constitute disorderly conduct as defined in our penal statutes.”
The defendants attempted to equate their actions with peaceful picketing. Of course, if they were engaged in peaceful picketing, the actions of the police in arresting them would have been illegal. But were they engaged in peaceful picketing? That term implies peaceful, nonprovocative. Can it honestly be contended that the acts of the various defendants, in placing themselves under wheels of the trucks and otherwise interfering with the progress of the trucks, were peaceful? Is it seriously claimed that such behavior would not tend to possible violence on the part of those against whom these acts were directed and thereby breach the peace? These questions pose their own answers.
The defendants argue that, since their purpose was to bring to the attention of the public and the authorities acts of a discriminatory nature, they had a perfect right to perform the acts of which they stand convicted, despite the prohibition of law, and no conviction may result therefrom. Certainly this court is sympathetic with the objectives which these defendants sought to achieve and it recognizes the justness of their cause and their well-intentioned motives. However, this court is limited as to the power it may exercise in the case at bar. It can only review the record and base its conclusion upon that record within the law as it is applicable thereto. It cannot engage in a dissertation of the philosophical and sociological questions which would be raised by a consideration of the objectives which these defendants sought to attain by engaging in acts which violated the law. It can only apply the existing law to the facts found below. If the evidence shows a violation of the law by these defendants, then the reason why they broke the law is immaterial and irrelevant.
The court realizes that the defendants were motivated by a desire to dramatize the impairment of civil rights in the area covered by the activities of building trades unions in the construction industry, but it simply cannot justify their behavior. *640 To condone their actions would constitute each one a judge of what law he will obey and what law he will not obey, depending upon his own personal convictions of right and wrong. Permitting this would constitute an abandonment by society of the rule of law, give support to lawlessness and invite anarchy.
Civil rights can be as much endangered by illegal methods used in an attempt to gain them as they are by those who would deny them altogether.
The dissenting opinion criticizes the joint trial of these defendants by the trial court and concludes that it resulted in a denial to the defendants of a fair trial. A number of cases are cited in support of this conclusion. An examination of those cases discloses that in some what was considered was not joinder of defendants, but joinder of counts and in the others the facts are entirely dissimilar from the facts in the case at bar. The fact is that every defendant stipulated with the People to hold a joint trial and the record clearly shows that every defendant was convicted on the basis of the particular evidence adduced against his own actions. It is interesting to note that this point is not raised on this appeal by any of the defendants.
For the reasons hereinabove expressed the convictions against all of the defendants should be affirmed.